Case number 23-7175. KLEO AG, a stock corporation formed under the laws of the Principality of Liechtenstein Appellant v. Rivada Networks, Inc., a Delaware Limited Liability Company. Mr. Parker for the appellant. Mr. Baboud for the appellee. Morning, Mr. Parker. You may proceed when you're ready. Thank you. Good morning, and may it please the Court. David Parker of Hunt & Andrews I'm here representing the Plaintiff Appellant, KLEO AG. This case concerns defamatory remarks that attacked KLEO's business reputation as a satellite service provider. The alleged falsity of those remarks is not an issue here on appeal. Rather, the sole issue is whether KLEO adequately alleged injury from those remarks, and KLEO did so in two independent ways. First, KLEO adequately pled defamation per se, meaning the statements are inherently damaging based on their nature. And second, KLEO adequately pled special damages as well, which is just actual injury from those statements. Now, the District Court held that KLEO didn't adequately plead either path to injury, and that was error. It also had important ramifications that go beyond this case. I'll start with defamation per se. Before you get going, if we were to rule for you on the question of special damages, would there be any reason to still reach the issue of defamation per se? I don't think you would have to, Your Honor. I think that would be enough for the claim to go forward and to reverse the judgment of the District Court. It would be enough for the claim to go forward. I'm imagining then you go back and are unable, as a matter of proof, to establish special damages. Then would you have lost the appeal of defamation per se, or would you have a preserved second appeal? That's a good point, Your Honor. Now that we're talking about it, I think you actually should rule on the defamation per se, because that allows us a different category of damages, which are presumed damages. So I do think even if you rule in our favor on the special damages question, you should also rule on the defamation per se question. Oh, we wouldn't have to. I don't think you would have to. You could, I guess, well, I don't know. I think you might actually have to, because I think it does affect the case. So I'll start with defamation per se, which means that basically the statements are inherently damaging. The law recognizes four specific categories of statements that are defamatory per se, and one of those categories is that the statement attacks a plaintiff's fitness for trade or business. And that's because such statements inherently deter others from transacting with the party. And here, Rivado's statements fit into that category for two reasons. First, some of the statements conveyed that Clio had lost its frequency licenses. Now, these frequency licenses are absolutely critical to Clio's business. Clio operates a satellite network that uses radio frequencies to communicate with Earth. Clio cannot use those frequencies without a license. And as a German court recently put it, losing these licenses would, quote, destroy the existence of Clio. So the restatement speaks to this pretty directly, and the restatement has been adopted by the D.C. High Court. And what it says is that a statement does attack a plaintiff's fitness for trade or business if it accuses the plaintiff of lacking a, quote, peculiar skill or ability that is, quote, necessary for business or trade. And that's been borne out in the case law as well. As we explained in the briefs, there— The question is, does it attack fitness for trade or business if they're just saying they had lost one set of frequency licenses, and they aren't disabled from seeking more, there's no categorical bar? This particular thing of value apparently had been purchased by Trion and— I'm sorry, that Revita had purchased an ownership interest in Trion, and Trion terminated the frequency usage agreement with Clio. So it's a one transaction, not an overall kind of disbarment or de-licensure. Yeah. So I think at this stage of the case, we have to, you know, the court has to accept the allegations in the complaint. And what we alleged is that losing these licenses would, again, quote, destroy the existence of Clio. And that was actually a court that said that. So whether, you know, if Revita wants to, in discovery, try to prove that, you know, Clio could have reapplied for these licenses, you know, that's something that it would be entitled to do. The concern would be that destroy the business seems kind of conclusive. Why? Is this the only frequency right available? There's no possibility of securing different frequency rights or getting these back? Right. So, I mean, I don't think that information is in the complaint or in the record at this stage. Right. But what we have alleged is that, you know, this would destroy the existence of Clio. Again, that's a court saying that. And Revita hasn't contested that. Revita hasn't— Why would it destroy the existence of Clio? Because Clio needs radio frequencies to communicate, for satellites to communicate with Earth. And it's lost those particular frequencies that it had. And according to Revita, that is, according to Revita, Revita now has those frequencies. So what we have in the complaint is that— Clio unable. Right. If somebody goes out and says that attorney is losing his bar license, that's a defamation per se because it suggests he's done something wrong. Right. If you say a business lost a contract, that suggests they lost a contract. It happens all the time. They can go get another one. They're now going to have litigation. Doesn't necessarily impugn the character of the business. Yeah. So what I would say to that, Judge Garcia, is I agree with you that a case of a professional is maybe a little bit different. But I don't think this case is more akin to losing just one contract because Clio needs these licenses to do any amount of business. But the question is, if it lost the licenses, is that because of incompetence or criminal action or what? Right. And I'm glad you asked that, Judge Randolph, because I don't think that there has to be some suggestion that Clio did something criminal or horribly wrong to lose the licenses. If you look at the restatement, what it actually says is one example of challenging fitness for trade or business is a merchant that is insolvent. And so that kind of allegation doesn't necessarily suggest that the merchant did anything horribly wrong. Maybe the merchant's clients just didn't pay him or something like that. Let me ask about that. I mean, I've considered this and it seems like that's why the kind of allegations that you said are not in the complaint would be important. This complaint said Clio was created for the one and only purpose of securing these frequency rights and the investors will totally abandon us if we do not have these frequency rights. Something like that. To make this, Clio lost its license tantamount to saying Clio is going bankrupt. So those kinds of, that context in this specialized kind of situation is just that. I have two responses to that, Judge Garcia. My first is that I actually do think there is some additional information in the complaint that goes to this. And that's that you have the allegation that satellite manufacturers approached Clio and then refused to do business with Clio. And then we have three other relationships that were allegedly lost as a result of this as well. So I think all of that kind of supports the German court statement that this would destroy the existence of Clio and deter anyone from... Yes, Judge Fillard. So those were the allegations that you're relying on also for the special damages. That's correct. And it struck me that, I don't know this business, but the use of the term partner, satellite manufacturers heard this and they refused to partner with Clio. What does that mean? What was the partnership before and what was the injury in terms of the partnership loss? Yeah. So I think a fair inference from the complaint is that what we mean by partnership is that the satellite manufacturers are going to enter into a contract with Clio to help build satellites that Clio needs to send up into orbit. And we did allege specific money damages that we suffered as a result of losing the relationships with those manufacturers. We even quantified... It was basically apparently traveling to hold a business meeting or some effort to reach out, it's hard to say what the delta is between the satellite manufacturer's willingness for and after. So there's nothing alleged about we were on the brink of entering a contract, or we had a contract. Satellite manufacturers were eager to work with Clio and were making better and better bids. And then after this, nobody would talk to us. We don't have any allegations that actually support, or do we have any allegations that actually support the notion that there's a before and after scenario that's different. I do think there is some of that in the complaint. We did allege in the complaint that prior to these defamatory statements, Clio was succeeding quite well in its plan of establishing its satellite network. Very vague. Succeeding in what way? It had launched multiple satellites, your honor. It had passed certain regulatory milestones, all that's detailed in our complaint. But the before and after, I think, is that before the statements, Clio was succeeding. It did have investors, and there's actually allegations of how much money we had raised by that point. We did have satellite manufacturers working with us if we were sending satellites up into space. I think that's a fair inference. It would have been so much more crisp, though, to say, we worked with satellite manufacturer X and Y and expected to continue to work with them. And when we circled back after the conference and after these defamatory statements, they said, we're not really interested in doing that anymore. And it's not inconsistent with what you've alleged, but boy, is it not spelled out. So, I mean, I certainly agree that there could be more detail on this issue alleged, but I think the question is whether there is enough in the complaint right now to go forward. And I think that there is based on the case law. Your proposition that the loss of an important business asset impugns the integrity and the competence of the business itself? So, I think it depends on what the asset is. And in this case, it's a license. The asset is? Yes. I mean, I think if it's an asset that would literally prevent the party from doing its business, like a license in this case, I do think that that rises to the level of defamation per se. And as to whether it impugns... What authority do you have for that? I mean, statements like this float around constantly in all kinds of contexts, speeches and conversations and so on and so forth. I think back about, well, I'm not going to get into the various companies and everything else. I could give you a dozen examples. So, the licensing cases fall into the category of the situation where the person can't operate their business because it's a unique business, like being a doctor or being a lawyer. If you lose that license, then you're not competent to be able to practice anymore. But a business that loses a major asset can still survive or try to survive by getting more assets or getting more capital or whatever else is necessary. So, I don't see those cases, those lawyer cases and the doctor cases having anything whatever to do with this case. Yes, Judge Randolph. So, I think that, again, what matters in this case is the importance of these particular licenses to Clio. And I think without these licenses, Clio has a satellite network that is essentially just worthless. And so, I acknowledge it's not exactly the same as the case of a professional, those are the closest cases that we could find. But I do think it's similar in that Clio cannot operate its business just as a lawyer or a doctor could not legally practice their business without a license. Well, it's like a lawyer or a doctor losing their office, not their license. I'm sorry, losing their office? Yeah. Well, I think they could still practice law though. Let me ask you about the China. That was the other prong of the defamation per se, right? Yes. The comments about China. And why is doing business with China a defamation? So, I don't think it's just doing business with China. I think the accusations were that Clio was a quote unquote front organization. And the implication was that they had deceived European regulators. They had set up essentially a European shell company to obtain these licenses under the pretext of using those for the benefit of Europe. That's your borders on criminal conduct? Is that the idea? I don't know if it has to be criminal conduct, but it's certainly dishonest. Dishonest in business. But doesn't that depend on the law of liquidation? And we don't know what the law of liquidation is. Right. And to be clear, we have not alleged that it would be illegal in that case for Clio to request licenses. Well, illegal or in violation of whatever regulations Lichtenstein has. Correct. We haven't alleged that either. We have not. No. I think that really the crux of this is the dishonesty in business and also the threat that if these licenses are transferred to China or the control of the networks is transferred to China, that the Chinese government could take over the project. I think those are kind of the two elements of that. So are you saying that... So Ganley refers to some very strict rules with regard to moving or de facto moving constellation rights from one place to another. And then, as you mentioned, refers to Clio intending to have a sort of front organization in Germany while actual control of the satellites would be with China. And I take it to you to be saying in response to Dr. Randolph's question that it actually doesn't matter whether there are very strict rules concerning moving constellation rights, but that his statement makes it sound to the average listener that there is a violation of very strict rules about foreign control that Clio has committed. Yes, Judge Pillard. I think that's a very good point. And I think that with respect to that point, it would not matter whether this was actually illegal if what Roboto is communicating is that it would be illegal. And wouldn't it have to be such that... I mean, if somebody says, oh, you gave her the bigger piece of cake, that's illegal under the Equal Protection Clause, here's the thing. And it would have to be that a reasonable listener in the position of the people that Clio thinks are the audience for this defamation would think that, would credit Gamley's statement that this is deeply unethical or maybe illegal, maybe even criminal. But I guess my question is if there's this insider crowd at the satellite convention, wouldn't they know the content of any such rules and how likely... I mean, I'm just probing whether it matters that you haven't actually told us what the real rules are on transfer. Because if there were real rules that prevented this transfer, it seems like it's easier for you to show defamation per se. Yeah. No, I think that's a good point, Judge Pillard. And again, this is not a theory that we focused on necessarily below. We were more focused on the dishonesty piece of this and the fact that if it's going to be taken over by China, that the Chinese government could step in and take over the project. But I do think that it would be fair to rule on this record on this illegality point if your honors thought that was compelling as well. What was the result of the... I mean, you mentioned this German court. I saw that sprinkled in the papers here. What was that all about? So there have been multiple litigations and arbitrations abroad concerning Rivada's attempted illegal takeover of Clio. So that's been challenged in multiple foreign tribunals. And as we explained in the complaint, we've already received some positive preliminary rulings, the equivalent of a preliminary injunction restoring our people to the board. So that's what those are about. And that German court, in the course of explaining this dispute, was reiterating how important these licenses are to Clio by saying they would literally destroy the existence... Was it Clio that sued Rivada? So there are multiple, I think there are maybe even three different foreign litigations and arbitrations happening. Is that because Clio in fact lost its licenses? Well, no. So we definitely dispute that. And as we've said, we've actually gotten some positive rulings in those foreign tribunals that we did not ever lose the licenses because... That's a matter that's being litigated? Yes, that's correct. And certainly at the time of... Right, because we're talking about the time of Rivada's statements. So, you know, I think there's an argument that later the Lichtenstein authorities did terminate Clio's licenses when they issued the order, but that was after the statements. And what Rivada was saying is that at the time of those statements, Clio had lost its licenses. But why doesn't that May 20th order from the Lichtenstein authorities, you know, defeat any, you know, causation argument? I suspect that's going to be one of the things Rivada says. It could argue that, Your Honor. I mean, I think that there's a time period between the statements and then that May, you know, whatever it was, order. And during that time, Clio lost a lot of Clio had to expend a lot of money to get those relationships back or to attempt to. But doesn't the Lichtenstein order go to the effectiveness of conduct that happened before that you were during the period of the statements disputing? But it's kind of a non-proton point, right? That Lichtenstein rules actually did effectively get the licenses. So I guess that would be if Rivada were to try to use that. I think that would be an argument that the statements weren't false, right? That Clio actually did lose their licenses, and that was confirmed by the Lichtenstein order later. That is not an issue on appeal, though. They have not argued that as an alternative ground for affirmance. The district court assumed that the statements were true. So again, the only issue here on appeal is damages and injuries. So with respect to the first defamatory message, yes, Your Honor. You mean assume the statements were false? Yes, I'm sorry. Assume the statements were false. Yes, exactly. So with respect to the first defamatory message that was per se about lacking the licenses, the restatement speaks pretty directly to this. It says that accusing someone of lacking a peculiar skill or ability that is, quote, necessary for trade or business is defamatory per se. And then we do have the cases in our briefing discussing professionals that lost their licenses. You said that goes to truth or falsity, but haven't you pointed to Lichtenstein stripping the rights as, in part, evidence of damage? Yes, Your Honor. So that is one of the four relationships that we say that we lost and that we say satisfies special damages. But that one has to now fall away? I don't think that one has to fall away, no. I mean, Rivada has picked on that one because I think they think it's our weakest case for causation, which I would agree with out of the four. But I don't think it has to fall away because of the language in the order. And I think they may even use that as a demonstrative later. But just because the Lichtenstein authorities didn't say in their order, we heard Rivada statements and that's why we're doing this, doesn't necessarily mean that we haven't proved causation. But really that is the causation for the claim that you focused on, which is the loss of manufacturer relationships. Correct. That's what we think is our strongest case of special damages and causation. And we only need one to go forward. So if you, it occurs to me that if you're, this category of damages is 4,000 euros of travel expenses. You don't say when that occurred. If those were incurred in June after the Lichtenstein order comes out, then that could seem like some kind of an intervening cause that cuts off a chain of causation. If it happened before May 10, then we would say it's irrelevant. Right. So do we know the answer to that question? We don't have a specific date on that. I think it's a fair and reasonable inference from the complaint that it would have been before May. I mean, you know, Clio's scrambling to keep the business alive. Exactly. And you would have stopped after Lichtenstein's order. Yeah. I think it would be a lot harder to get satellite manufacturers after that order came out. Exactly. And so again, with respect to the second message that was defamatory per se about Clio being a front organization, I mean, that really conveys two different things. That Clio isn't really a real company. It's just a shell company. And also that Clio has lied to regulators and others by pretending to be a European company, pretending to get this license on behalf of a European company. And again, the restatement, which has been adopted by DC, says statements challenging someone's, quote, honesty in business are defamatory per se. And the district court itself actually acknowledged this. It said that the statements accused Clio of fraud and deception. And I should also say that with respect to the first defamatory message about lacking the licenses, I think the district court acknowledged that as well by saying it challenged, these statements challenged, you know, Clio's viability. So I think the district court really made findings that supported and necessitated a ruling of defamation per se, but then didn't actually go through with ruling that. So I'd like to turn now to special damages. And this is the second independent ground for reversal of the district court. The special damages are not actually that special. They're really just actual damages from the defamatory statements, and they must be pled and proven in any defamation case where there's not defamation per se. So I think that makes this issue in particular important to other courts. And what Rule 9G says is that these damages must be specifically stated, and this court has interpreted that to require two things. First, that the plaintiff described the nature of the losses. The district court held that we satisfied that element. Rivada doesn't dispute that on appeal. It's really the heart of the dispute is causation and the way in which the special damages resulted. And we've touched on that already. I think we had four different relationships that we said we lost in the complaint. As I said earlier, I think our allegations about the satellite manufacturers are the strongest. And what we alleged there was that within, you know, several days of Rivada's statements, multiple satellite manufacturers approached Clio and expressed concerns that Clio was going to fail or was likely to fail, and then they refused to partner with Clio. So they were essentially repeating back the bottom line message that Rivada had just conveyed about Clio, you know, failing or being likely to fail because of the loss of these licenses. I think that's a pretty close causal link to have in a complaint. I think it's more than enough to establish plausibility in this case, and it's more than this court has, you know, more than the allegations in other cases that this court has held to be sufficient, as we've explained in our brief. Wasn't the try-on vote to shift the licenses away from Clio before the challenge statements? And isn't that something that disrupts the alleged causal relationship to any of the damaged relationships that you've identified among your four sources of special damages? Yes, I'm glad you raised that, Judge Pillard, because that, I think, is an error that the district court made. So, you know, what the district court held, I think this was in a footnote, was that, you know, there's the allegations would support a reasonable inference that these earlier actions of try-on, et cetera, are what caused the satellite manufacturers to have concerns and not Rivada's defamatory statements. And what I would say is that is certainly possible. That's a theory that Rivada could prove on appeal. But at this stage of the case, we're on the pleadings, and the court has to draw all reasonable inferences in our favor. So if there's a reasonable inference that the statements, that Rivada's statements caused these damages, but there's also a reasonable inference that Rivada's earlier illegal, what we say is illegal conduct, caused that, I think that inference has to be drawn in favor of us at this stage. And the district court also drew reasonable inferences against CLIO when it reasoned that it wasn't clear when these manufacturers approached CLIO. So what the court said was, I see that Rivada made these statements on the second day of this four-day conference. I see that the manufacturers allegedly approached CLIO during the same conference. But essentially, it's possible that the manufacturers approached CLIO on the first day of the conference, which would have been before Rivada's statements. And I think this is really a classic example where the court should have drawn a reasonable inference in favor of CLIO. If you look at the complaint, the entire thrust of the complaint is describing the impact of the statements at that specific convention. It says, quote, the immediate impacts were felt there. The purpose and result of the statements was to discredit CLIO there. Even the paragraph that discusses the manufacturers approaching CLIO with concern starts with after the defamatory statements. So I think that the court absolutely should have drawn a reasonable inference in favor of CLIO. And that footnote where it says, I think there's a reasonable inference the other way, I think is particularly concerning to leave out there. Now, Rivada doesn't really challenge this, which I think is also telling. They don't defend the district court's reasoning. They don't say it's unclear from the complaint when the manufacturers approached CLIO. And so I think they don't defend it because it's extremely difficult to defend. We've given you a lot of time. We've taken up a lot of time with our questions, if you could wrap it up. Yes, thank you. I'll wrap it up really quickly. So the second mistake, I think, was the district court, I think, effectively raised the burden for alleging causation on the pleadings, which should be plausibility. But the district court effectively held that even that close temporal link was not enough. And I think, you know, if that ruling stands, you know, other district courts may be encouraged to similarly raise the burden from plausibility at this stage. So with that, I'd like to respectfully ask that you reverse the judgment of the district court and allow CLIO to pursue the discovery. Your Honours, on behalf of the appellee, Revata Networks, my name is Daryush Babood. And before jumping in, Your Honours, let me just say that it is an absolute honour and privilege to be here. This is my first argument before this court. It's an absolute honour. Thank you so much for hearing me today. Now, Your Honours, before I jump in, I will address defamation per se and special damages going in the same order as my friend, Mr. Parker. However, before getting into that, Your Honour, Judge Pillard, I want to specifically address first the question that you asked my friend, Mr. Parker. Your Honours, I think this court does need to resolve the defamation per se point because, and the alternative, as I think you were suggesting, Judge Pillard, we go back down to the trial court, file another motion to dismiss, or even go through trial, they end up losing, and then have they preserved the defamation per se argument? We come all the way back here again and start another appeal. So I do think the court has to resolve the defamation per se point as well. Now, I also want to specifically address a couple of points that Judge Pillard and Judge Garcia that you mentioned regarding the per se point. CLIO can obtain other licenses. Now, it's not specifically alleged, or they didn't specifically allege, as you pointed out, I think Judge Garcia, there's only one license. In fact, they actually specifically said the opposite. In paragraph 14, Your Honour, they say radio frequencies used by satellites are a limited and valuable resource. So CLIO itself is admitting that there are frequency licenses that can be obtained. Now, regarding defamation per se, Your Honours, as we know, they have to concern extreme subjects like criminal behaviour, or as relevant in this case, a person's suitability for their chosen profession. Now, as Mr. Parker argued here today, they allege that these statements are defamatory per se because they convey two messages. Number one, that CLIO lost the frequency licenses, and so they didn't have the legal ability to conduct their business. And then number two, that CLIO was planning to move its network to China. But first, Your Honour, there's a couple that I would like to make in regards to the licenses. So in its briefing and in here today, they falsely state that Bravado's statements falsely convey that CLIO lacked the legal ability to conduct its business. However, Your Honour, it's really important to look at the complaint because that is, after all, what they're confined to on this motion to dismiss. If we look at pages 111 to 114 of the joint appendix, CLIO alleges that in regards to the concerning these licenses, which are statements two, five, and six, Your Honours, the statements, CLIO alleges, nearly discredited CLIO in the eyes of the satellite community by giving the false impression that CLIO's rights to commercialize the relevant frequencies, and this is the important part, Your Honours, were more attenuated or uncertain than they actually were. Close quote. So, Your Honour, nowhere does CLIO allege that these statements convey, as it now argues in its appellate briefing, as it argued here today, that CLIO lacks the legal ability to conduct its business. Well, this is a pleading, a motion on the pleadings, and at the same time that CLIO is claiming that it's suffering this defamation, it's also contesting whether it lost its licenses. It's saying that, you know, the move by Rivada to get them was itself unlawful. So, it seems like that might be an explanation for saying it's more attenuated, that its underlying position on the status of those licenses is that it still rightly owns them. So, why isn't that just the explanation? And the statement is still defamatory because the statement is CLIO lost its licenses. That's the statement. It speaks for itself. And they're saying lacking the legal ability is like they have no license. They got no legal basis. Right. So, Your Honour, even if we assume that they did allege that, Your Honour, the key is we have to focus on what the word suitability and fitness even means. I think all three of you, Your Honours, raised this point with my friend, Mr. Parker, is, you know, these licenses, well, let me back up for a second. Rivada's statements did not convey that CLIO the license to be a satellite network provider generally in the same way that an attorney needs a bar license or a doctor needs a medical license to practice law, like many of the cases that they cite to. And Judge Randolph, you made, I think, the crucial point here, which is when it comes to professional licenses, when you're talking about individuals, like a dentist, a doctor, a lawyer, when that person receives that license, what is the medical board or the bar telling that doctor or license? They're telling that doctor, that lawyer, that they have the qualifications necessary. They have the skills and competence and abilities necessary to provide medical services, to provide legal services. These frequency licenses are not the same thing at all, Your Honour. But they're also not the same thing as, you know, buying inventory that's widely available. I mean, if you're a franchisor that wants to set up a restaurant at a national park and you, you know, you think you've won the bid, but somebody, you know, falsely says that you haven't, and therefore you have no prospect to run the business in the park, and so nobody will give you the equipment. I mean, that's, so it's a rare, it's a rare, it's a rare asset and it may not come around again. Right. So, Your Honour, I'll go a step further than that. Let's say that, that Rivada alleged that Clio did not have a satellite, right? They're a satellite network provider. That is probably the most crucial asset for, for Clio. So if Rivada had said, Clio doesn't even have a satellite, Your Honour, as I think all of you have mentioned, that's just, it's a crucial asset. It doesn't go to their, to their skills or competence. No, but it seems to actually make their point more than yours, in the sense that there is a legal precondition to doing this business, which is that you have a license. Right. And everything else is, you know, the whole industry is eager to get a satellite network up and running, that the folks that are lucky enough to do it are the people that have the legal, the legal rights. Right. So seems like maybe you're right that we don't have a satellite network. I'm not sure that that establishes, it's saying you have no license. Right. Doesn't establish, defamation per se. Right, Your Honour. But I think, again, what we really have to focus on is what the word suitability and fitness really means. So what about the front, you're just a front company, you're not a real company. Right. So, so, Your Honour, that's a, that's a really good point. And it's something that I wanted to specifically address. So regarding the front organization, in their briefing, and here today, Mr. Parker argued that Declan Ganley, the CEO of Rivada, stated that, that Clio was a front organization. But that's not actually what Rivada stated. If we turn to, Your Honours, I believe it is, so it's page, page 10 of the second amended complaint or joint appendix, page 108. What Rivada actually says, allegedly, here, Your Honour, is, it's the third paragraph down on page 108 of the joint appendix, Your Honour. Rivada allegedly say, it says, these are European filings. And it was pretty obvious, not just obvious, but categorically stated that the plan was to move these to China. I'll focus on that specific portion of that statement a little bit later, Your Honour. Rivada continues, and while there would have been, if you like, a sort of front organization left in Germany, everything else would have been moved. So Rivada was not saying that Clio is a front organization, or was a front organization. It's a little bit more attenuated than that. What Rivada was saying is they're moving to China, categorically stated they're moving to China. Now in their briefing, they allege that, or they argue, that Clio, that Rivada said there was a secret plan to move to China, but it's actually exact opposite. It was actually categorically stated. But just to focus again on the front organization, Rivada was just saying that there's a sort of front organization left in Germany. So what they're saying is, allegedly, Rivada is going to move, sorry, Clio is going to move to China, which there's nothing wrong with that. It doesn't go to suitability or fitness. And that would be left in Germany is this sort of customer-facing company left. It doesn't really concern, it doesn't go to that extreme subjects that defamation per se is reserved for. Why is that? I'm not sure I followed that point. Right. So again, it doesn't go to the suitability or fitness, Your Honor, certainly doesn't go to solvency. And I'm not even really sure it goes to dishonesty. Clio, I think, does well in focusing on the word front, because you immediately think, oh my gosh, this is a fake company. But that's not where Rivada was actually saying there. Again, we're not saying that Clio is a front organization. What he was saying is- I think he meant Shell. I'm sorry, Your Honor? I think he meant Shell. Right. But again, even if we assume that's the case, I really don't think that goes to sort of dishonesty that the restatement is speaking of that Mr. Parker refers to. It's not like they're moving their company into the mafia. Exactly, Your Honor. Exactly. They're simply stating that- We have United States companies in China. Exactly, Your Honor. Exactly. Countries from all over the world. Exactly, Your Honor. I don't think it's any different than if Rivada had said that Clio was planning to move to Russia or some other country. It just does not involve the sort of extreme subjects, dishonesty, or again, to go back to the suitability or fitness for your chosen profession, Your Honor. Counsel, can I take you to the special damages and causation? Absolutely, Your Honor. Clio realizes that strongest claim is that the statements deprived it of potential business with other manufacturers. And I just want to hear what your best response to that argument is. Yeah. So, Your Honor, there's a couple of points that I'd like to make in regards to that. So, all Clio has alleged, well, first of all, let me back up a little bit. As we know, Clio had to satisfy the Rule 9G heightened premium requirement. They have to connect the I do think the manufacturers— This is an interesting legal question. Are you submitting that the Rule 9G, it certainly requires damages to be specifically stated? Yes, Your Honor. Do you think, and why, does it impose a heightened pleading standard for causation? Or are we just using the Twombly-Iqbal standard, which is no slouch in the first place? No, Your Honor. So, it does apply to the causation standard. And if I could point the court to this court's Fowler decision, which we referenced at page 24 of our brief, therein specifically, this court states, where special damages must be alleged before a cause of action can be stated, the courts require a good deal of particularity, especially in the slander and libel cases. The complaint must set forth, and this is really going to the causation point, I think the first sentence also goes to it, but the complaint must set forth precisely in what way the special damages resulted from the spoken or written words. Doesn't the Smith case say that as well? I'm sorry, Your Honor? Doesn't the Smith case say that as well? Yes. Yes, it does, Your Honor. And I wanted to focus on the Fowler case in particular, and Judge Pillard, I understand that you authored the Smith case, but I wanted to focus on the Fowler decision in particular because of that first sentence that I just mentioned. When was Fowler decided? That was decided in 1950, Your Honor, but still very good law in other cases, of course, expanded upon that. This sounds like it's saying you have to do something more than noticeably. We had a post-Twombly case saying, I genuinely, I could not find a case that addressed whether causation post-Twombly has to be established with more than what Twombly requires. And there's certainly a strong argument because as Judge Easterbrook points out in the Pippin case, Rule 9G does not say you have to plead special damages with particularity, the same way you have to plead fraud. It just says the damages have to be specifically stated, and that's just distinguishing from general damages. So it doesn't necessarily carry a heightened burden on causation. So I would respectfully disagree, Your Honor. I think the verbiage used in these cases stating that in order to satisfy Rule 9G, or even taking that out, in order to satisfy the causation requirement in order to plead special damages, specifically stating that defamation plaintiffs have to establish the natural and direct result of defendant's conduct and how that resulted in harms, I think that goes above just simple Iqbal Twombly or notice pleading standard, Your Honor. Okay. So then let's go to what the actual allegations are, because it seems like the favorable reading of this complaint is we were proceeding apace. We had put satellites into orbit. Then on the second day of this big conference, Stanley says, we don't have our licenses. Over the next two days, manufacturers come and speak to us and express those same concerns, and now they won't work with us. Sort of very close in time, as your friend on the other side put it. And so what's specifically the gap in the causal chain? Yes, Your Honor. So I'll address that by bringing up a point that Judge Pillard brought up, Your Honor. So I think the court below specifically addressed this, Your Honor. And so it states, citing this court's heading judge decision, that the court need not accept inferences drawn by the plaintiff if those inferences are not supported by the facts set out in the complaints. And at the joint appendix, page 108, footnote three, on top of, you know, the court determining that after shortly after is not enough to satisfy Rule 9G, the court also then goes to add on additional layer as to why CLEO has not quite satisfied. Yes, what is the point? Exactly, Your Honor. So in their own complaint, they say that in the second half of 2021, so before the statements, Rovada launched a plan to take control of TRION's board by secretly purchasing ownership interests. It's at paragraph 27 of CLEO's complaint, page 105, the joint appendix. And then on top of that, on March 2nd, 2022, so also before the March 22nd, 2022 statements, the TRION board then, that Rovada attempted to install, then declared the termination of the frequency usage agreement. So it cuts off, I believe is the verbiage that Judge Pillard used, cuts off that compensation. In the complaint that everyone in the industry knew that the newly installed TRION board had done that? No, Your Honor, there isn't. So I think that in the drawing favorable inferences, right, the allegation is on the, let's say, the biggest platform in this industry, he goes on the podcast, he makes the statement, the next day everybody knows, and the next day everyone expresses concerns. You have certainly a plausible counter-argument, and you might get there after discovery, but it's hard to see why another plausible explanation that manufacturers had doubts because of the March 2 vote means it's implausible that it was also, at least in some measure, caused by the statements during the conference. How would you bolster that? Absolutely, Your Honor. So I think, so CLIO, first of all, CLIO had three attempts to try and establish this more perfectly. The court below provided CLIO with three attempts to get to causation, get to causation, get to causation, and as CLIO has alleged in their own complaint, this is a close-knit community, so presumably they could have easily stated, Your Honor, that, and they did not, that any of these individuals attended the conference, heard the statements, or even knew about the statements, or when they told CLIO we're leaving and they have business relationships with these individuals, told CLIO, look, I heard the statements, I believe them, that's why we're leaving, but they haven't stated that at all. The best that CLIO has been able to come up with. I thought they did allege that satellite manufacturers expressed to them that they were concerned about this. So that, so what they do allege, Your Honor, is that during the conference they expressed this belief. So bracketing the district court saying, oh, we don't know whether it was before or after, this is, again, it's a complaint. We draw all inferences in favor of the plaintiff. It's, much more of the conference went on afterwards. Their whole focus is on these defamatory statements. The fact that as a technical matter they haven't said after the podcast, to me, that's, I'm not going to rely on that as, as fatal under the pleading standard. So given that. But, but Your Honor, I think it's important that when CLIO could allege that something was specifically after or shortly after, they did. Okay, is that, is that your best argument? You're hanging on that. I think that's the best argument that we have, Your Honor, because if, if it really was after, then they would have alleged that, especially after three attempts, when something was specifically after or shortly after, and they could provide a specific date they did so, but the best that they can come up with here is that during the conference this happened. But a second point, Your Honor, is there was no parodying, quote unquote, of the, of the, of the manufacturer's statements, Your Honor. So the manufacturers claiming that CLIO was likely to fail, that could have very well come from, from before, as again, this is a close-knit community, before TRION terminated the usage agreement, which, as Mr. Parker stated himself, is absolutely crucial. So given that this is a close-knit community, I think it's also reasonable inference that these manufacturers heard about this terminated frequency usage agreement, and that would absolutely be, mean that CLIO was going to fail or likely to fail. Simply stating that they're going to move to China, or again, saying that they're going to lose their licenses, which already happened after the Legislative Science Office of Communication made this determination, Your Honor, it's just, it's, it's not enough here. I don't think, I think the District Court was correct in assuming that even giving CLIO all reasonable inferences, if here is 9G and here's, they haven't sufficiently alleged 9G, they're, they're just, they're over here. They haven't alleged enough to get past Rule 9G, Your Honors. Let me ask you, Mr. Behbood, on the question about the accusation that CLIO intended to evade well understood regulatory requirements by transferring control of the Satellite Constellation to China. Why, why isn't that enough to, to raise a question or to besmirch CLIO's honesty in business, which is a standard basis for defamation per se? I'm sorry, Your Honor, can you say the first part again? So the podcast, Stanley says, CLIO intends to evade well understood regulatory requirements by transferring control of his satellite, its satellites to China. And an accusation that someone plans to evade well understood regulatory requirements would seem to me to question their honesty in business. And questioning a party's honesty in business is one of the categories of recognized defamation per se. So I don't believe that's one of the categories of recognized defamation per se, Your Honor. So there, there are a couple of district court opinions from the fifties or sixties, and there is the restatement, but in trying to find circuit court opinions that specifically address this honesty in business, there is no such thing. So you would say that our court should reject that as a category and say, there might be circumstances in which some questioning of honesty might amount to defamation per se, but not this? Not this, Your Honor. I think- Even though the restatement does identify it. I think even though the restatement identifies this, Your Honor, the restatement is not controlling on this court. I think we have to look at what our circuit states, and there's nothing like that suggesting that this is the turning point. So if someone were to say publicly that everyone knows that you're not honest in your legal practice, you would think, well, that's not, that's not defamation per se? I think, so Your Honor, I think there's an important distinction to be made between corporations and individuals. So, you know, saying that a lawyer is not honest, very much like, I think it's the Ingrer decision where the court determined where, I believe the statements were either unprofessional, unethical, that goes to the suitability or fitness of one's chosen profession in that regard. But corporations stating that there's an intention to perhaps not follow these particular rules of Lichtenstein, I don't think that's, that's enough, Your Honor. Really? Here, they're basically, the point is they're not following the rules. And in fact, a front or shell corporation that is facilitating what, you know, whether this is true as a matter of positive law or not, they're arguing that there's some ban on foreign control, and that this company is structuring its business, its whole only business project that we're aware of, in order to evade those and to give control to China at a time when many, you know, regions of the world are feeling threatened by competition from China. I just don't think it's enough, Your Honor. Given what our established precedent is, it has to go to the suitability or fitness for the chosen profession. I just don't think that gets to and meets what our established and well-established law is in the circuit, Your Honor. So if, if I may, Your Honor, there's just, there's another, one last point that I would like to make in regards to special damages. And we submitted this to Your Honor's via court, a Circuit Rule 34I. It, the, on paragraph 45, CLEO references this May 20th, 2022 order from the Legislative Science Office of Communication in its complaint, but doesn't attach it. So as part of our preparation, we submitted it to this court last week. And in this nine-page opinion, Your Honor, this decision from the Legislative Science Office of Communication, nowhere does the Legislative Science Office of Communication mention the DC conference, let alone Rivada's alleged statements that were made during the conference. There's not a single line, a single word, a single page that would indicate that this office, the Legislative Science Office of Communication, was somehow influenced by, as the alleged paragraph 45. That would show that the statements didn't affect the actual loss of license rights. Exactly. Do you think it's relevant to any other claim case? I think it's particularly... Let me take the point. Yeah. Yeah. Okay. But, but you, sorry, I cut you off. You're not submitting that it's somehow relevant to another claim in the case. I think it's, it's relevant in the sense that the Legislative Science Office, only relevant in the sense that the Legislative Science Office of Communication approved the transfer of the frequency rights. So again, to go to Judge Miller's point, it sort of cuts off the causation. Okay. All right. Thank you, Your Honors. And did Mr. Parker have any... We'll give you a couple of minutes to make a rebuttal if you want it. Yes. Thank you, Your Honors. I just have a few points to make in rebuttal here. So my friend on the other side said at one point that all Rivada said was that there would be a front organization left in Germany. I mean, the front organization is Clio, according to that statement. What they're saying is Clio is a front organization that's going to obtain these, move it to the real company, and then all that's left is Clio holding nothing in Germany. Second thing is they say that honesty in business should not be a category of defamation per se, and that that's not been accepted in any circuit court. It has been accepted by the DC High Court, and this is an issue of substantive law where that's going to govern. That's the Ingber case, and it's at 1268, and it says the statements were, quote, clearly slander per se because they imputed a lack of honesty, character, or integrity. My next point is there was a question about whether Rule 9G imposes some heightened standard for causation. I think the answer to that, Judge Garcia, is no. It arguably imposes some specificity requirement for causation, but the ultimate threshold there is still plausibility. There's no case that says, you know, you have to establish, like, by a preponderance or something like that on the complaint, and that would be kind of big news in light of Iqbal and Twombly. So the specificity is about the amount of damages and the character of them, and are you saying that it's also specificity about causation, or just that once you've identified these are the damages we suffered, this is the, you know, the amount incurred, what it relates to, and then the causation is Twombly, or are you saying the causation is more like particularity under the fraud or mistake aspect? Right. So, I mean, honestly, as I read Rule 9G just on its face, it seems to be talking just about the character of the damages, but this court, I think in the Smith versus Clinton case, said that it also relates to causation. But I think you have to read that, you know, what this court was saying there in light of Twombly and Iqbal. I don't think the court was saying, you know, I think at most what the court was saying is you have to allege specific facts to show causation. You can't just allege it in a conclusory manner when we're talking about special damages. But I don't think that actually raised the bar above plausibility. So, it's enough to just show correlation, not causation? I mean, I think it has to be… On January 1st, Mr. X said Y. On January 30th, we lost money. That's enough. I think it's a fact-dependent issue, right? And I think it depends on whether that gap in time, given all the circumstances, allows a plausible inference of causation. So, there might be circumstances where that gap in time wouldn't, but in this case, I think it does because it's only a few days and they're basically parroting back the bottom line of Rivada's message. I mean, that kind of sequence is a classic form of circumstantial evidence of causation. Yes, I would say so, Your Honor. Then my last point, I know I'm over my time, is just that, you know, what my friend on the other side said was that it would certainly be a reasonable inference to say that, you know, these concerns of the satellite manufacturers were caused by, you know, Rivada's prior actions. And, you know, the court said that as well. I think that's actually almost fatal to their case because if they're acknowledging that that's a reasonable inference, I think it's an even more reasonable inference that they got those concerns from a podcast that is directed towards the industry. It's a close-knit industry that's well aware of this type of media. I think that's an even more reasonable inference. And again, if you have reasonable inferences going both ways, you have to choose the one that supports us. Thank you. Yes, thank you. All right, the case is submitted.
judges: Pillard; Garcia; Randolph